Please all rise. Hear ye, hear ye, hear ye. It is an honor to welcome you to the court of the 2nd Judicial District. It is now appropriate to resume to adjourn. The Honorable Susan F. Hutchinson will present. Please be seated. Your Honor, this case comes on Tuesday, 16-0063. The people of the state of Illinois claim that Kathleen, the invalid Teper, attended the court. Our approval will be halved. The plaintiff comes before you, Mr. Marshall, in speech. Our approval will be halved. The plaintiff, Kathleen, Mr. Kelly D. Slaw. I think we have it backwards. But that's all right. I don't need to speak up. No, that's fine. I would have remembered. Well, good morning, gentlemen. And, Mr. Slaw, we will let you argue on behalf of the appellant. You may proceed. And I thought you had gotten a new job. I was confused. No, I'm ready to retire now. That's how it is. May it please the justices and counsel, for the record, my name is Terry Slaw, S-L-A-W. I'm associated with the firm of Allen H. Shiffrin & Associates. We're out of Raleigh Meadows, Illinois. We represent the defendant appellant in this cause, People v. Valerie Teper. Our client is Valerie Teper. We believe that the trial court, there is a main issue here, which is subject, in our opinion, to be reverse of the trial court's decision. Of January of this past year, that the trial judge, in the case before this court, appellate court, gave improper construction of a certain statute regarding limited immunity from prosecution for overdose from narcotic. That the trial court's decision in denying the motion to dismiss the conviction of the stipulated bench trial, and then the denial of the motion of reconsideration, was against the legislative intent. The legislative intent here, when the bill, do you remember when the bill was being touted and was drafted and written? It was to protect people who were sharing needle, sharing cocaine, sharing heroin, and rather than letting their friend that they're with die, they were encouraged to call 911, don't run. It's a Good Samaritan law, would you agree with that? Correct, yes. Do you know the parable of the Good Samaritan from the Bible? No. Are you familiar with it? I am. Well, we use the Good Samaritan language throughout the code, the code of civil procedure, and Good Samaritan law is to protect people who are helping others, and the other would be the person in distress, like the Good Samaritan in the Bible. So who's the person in distress here? Your client, correct? That's correct, Your Honor. And who's the person who's doing the good act? The people who called 911, correct? That's correct. So who does the Good Samaritan immunity protect here? Under subsections B and C of the statute, I believe it could protect both. B protects the person making the, and the statute is 720 IOCS 57414, brought forth pursuant to Public Act 097-0678. B protects the individual who may or may not have been with the overdosing person, and C protects the individual who is suffering from the overdose. There are many different narcotics that qualify for this. The narcotic in this case was heroin, and because the threshold is three grams or less, and the record stated that it was 0.4 of a gram, so she qualified for the limited immunity. The statute speaks in terms of a person seeking or obtaining emergency medical assistance, correct? Yes, Your Honor. She wasn't seeking it, obviously, right? She obtained it. She was dying in her car. Well, she wasn't seeking medical attention, correct? She obtained it, that's correct. So it would have to be, then, your argument that she was obtaining emergency medical assistance? Yes. So your position, then, is that the police officer was providing her emergency medical assistance? The police officer stabilized her condition, Detective Stoss, when he came out on the scene. And he ejected her with the narcotic? But there were a couple of things that he testified to that occurred before he used the narcotic. And he said he got to the car, she was turning blue, her breath was very difficult, she was not responsive, and he looked over and he saw some things. Yes. And that's why he gave her the shot? Well, yes. He went out to the scene. There were multiple calls from individuals, from the public. Not an individual who was sitting next to my client. But I don't think that matters in interpretation of the statute, B or C. I understand your point. Yes. If she had, for example, she had overdosed or she had taken a certain amount of drugs and felt that she was in need of medical treatment and she had walked into an emergency room and she obtained treatment, she could never be charged if it's a small amount, correct? Yes. Isn't that what the statute is referring to? A person who takes action to obtain, to seek or obtain. A person has to take action just like the Good Samaritan who takes action. And, you know, the message is be like the Good Samaritan. Take action. Call 911. Do something. What did she do to obtain emergency medical treatment? What did she do? What action did she take to seek or obtain emergency medical treatment? Her personally? Yes. She was dying in the car. She was incapable of calling 911. But immunity, all immunities, whether they're in civil code, criminal code, protect people for action that they have taken. What action did she take to obtain medical assistance? To seek or obtain medical treatment. I don't believe subsection C requires her to take action she obtained it when an individual called in on their behalf looking at subsection C. A person who is experiencing an overdose shall not be charged with prosecuting. So she was experiencing an overdose. So you're saying that the statute, the intent of the statute is not that the person has to affirmatively seek medical assistance themselves? In part, yes, because it's not realistic to say that the statute, if the intent of the statute when created, and there was a lot of political give and take downstate. I've done some research on it. If the point of the exercise, if the point of the exercise and the intent of the statute is set forth in counsel's brief, and the preamble to the statute is because of this opiate epidemic, and if the intent is it to save lives, if the intent of the statute is to save lives, and my client is experiencing an overdose, yes, she's sitting behind the wheel of a car turning blue. The police officers come on the scene. The police officers come on the scene. They notice her turning blue. They notice there was a comment about the needles. There was a comment about some cotton in the front seat. In a can. Yeah. So did she call 911 herself? No. It's undisputed. Did she, could she have walked to the hospital? No. When you refer, when you look at the statute, the subsection that you're focusing on, subsection C, a person who's experiencing an overdose is tied to the second clause referring to a person, isn't it? Aren't those clauses tied together? It's the same person, not some other person. A person who is experiencing an overdose shall not be charged, et cetera, if evidence for the class 4 felony possession charge was required as a result of the person seeking or obtaining. It's the same person. So she protects the person who is at home or in a car somewhere and realizes that they have made a mistake. First of all, a mistake to use at all, but they've taken more drugs than their body can tolerate, and they call 911, and they say, I'm at such and such a location. I need help. But she, this individual, was not capable of calling 911. The immunity provision does not protect her. She is not that person, then, because she is not the person seeking medical treatment. She obtained medical. It's a two-part case. I understand what you're saying, seeking or obtaining. Both of them require action. Or obtaining. They're not tied at the hip, I don't believe. So if you obtain, she obtained it. The statute is silent. It doesn't say, well, Tepper, if you don't call, sorry, you can die in the car. I mean, there were certain citizens who called. Well, the citizens were calling because she was in the middle or in one of the lanes of Route 120 at lunch rush hour, which they probably weren't calling to give her assistance in that regard. They wanted her car out of the way. Yes, they did say that there was someone in distress. Correct. The state's argument, one of the state's arguments, is that if you look at the plain language, and the language is pretty plain, to seek, obtaining, they all require some sort of volition. And if you look at any dictionary, it appears that their position is supported by those definitions. And so how then do you respond to just plain language issues rather than the Good Samaritan issue, which, and they're very close, I agree, but it's plain language, to seek or to obtain. I think she obtained it. It doesn't matter how she obtained it. It was obtained. It was obtained. And in my opinion, common sense, if the statute is for overdose, I can't quote you any stats. If an individual is overdosing, what percentage of them are turning blue? What percentage of them are groggy? I can't quote you a stat on that. That argument makes some, from a policy standpoint, makes some sense. But she obtained it. It was obtained. I don't think it's relevant, Your Honor. But we're not policy makers. It's a policy argument. That argument has a lot of appeal because you're really, the statute only grants you immunity for small amounts, so you're not talking about the drug dealer who overdoses and has large amounts. That has some appeal. I mean, the problem is, as Justice Hutchinson pointed out, the plain language statute doesn't support your position. I would especially disagree. In an argument, if the, I mean, I believe maybe the statute, it's ambiguous that in concepts of lenity, I think it should be for this defendant, it should be interpreted for this defendant given the great public concern. I mean, I just went to a panel discussion in Wheaton last week. I went to one in Buffalo Grove. Mr. Nearheim spoke. It's all over our state and all over the United States. Most states today do have this limited immunity Good Samaritan statute. So, octane, what does it mean by octane? Well, if it's ambiguous, then I'm asking that the court, in the legal concept of lenity, which Apolli raised in their brief, fine for this defendant because the legislative intent, the legislative intent is to save lives. Do you want to, I'm assuming that you've read the statute and you've also read section E, right? That's the disqualification statute, yes. Right. Do you want to just address that for a moment about how that applies or does not apply, especially in the context of the, it's about the second point in, right after the subsection, you mentioned subsection B or C. It uses the language taking action to seek or obtain emergency medical assistance. So it is using the language that the person does have to take action to seek or obtain emergency medical assistance. Do you want to address that? Yes. Thank you. She, this defendant, was overdosing. She obtained medical attention through, albeit, because officers came on the scene. My analysis is strict construction of obtain. It doesn't say, well, obtain because Tepper went out and tried to broadly walk to the hospital down the street or Tepper was able to find her cell phone and call. She obtained it. So if the word obtain is ambiguous because it doesn't specify or set forth a strict definition of obtaining the statute, I would say that because she qualified it was possession of a small part, less than three grams of heroin, she obtained it. Now, and this isn't hypothetically, if someone came out on the scene and there was a 911 call and police came on the scene and then under further investigation, they decided they could charge this individual with delivery or aggravated battery or drug-induced homicide. Maybe that's different. But in this case, the limited function of what occurred on April 16, 2015, around 12-15, was just what the statute was enacted for, to keep people alive. But now let's then look at what happened when they got there because this is kind of important. There are many, at least that we've seen from this bench, there are many illnesses, distressing situations where there is difficulty breathing, there's unresponsiveness, and there's the turning of blue. Could have been a heart attack. Narcon would have effectively accomplished probably death on a heart attack. Could have been a seizure. I mean, you don't inject that drug just because someone is turning blue and having difficulty breathing. You have to have a reason. They determined, based upon what they found in the car, that they believed this was the reason, and thank goodness they were right. Absolutely. And so there was an investigation before, or there was a preliminary investigation before they gave her that shot, which seems to take this out of the immunity situation. I don't believe so, and here's why. Because they went out, it all happened, and there was comments by Officer Harrell and Detective Stolz. They went out there, they saw her, and it was boom, boom, boom right away. It's my argument that obtaining the medical assistance doesn't start with the narcon injection. They went out to the scene, called because an individual was in distress. If two people are sitting together doing an overdose and one of the individuals dies of a heart attack, does that mean that the 911 call was fruitless? I don't think so. Any individual, if they're not a licensed medical doctor or not a registered nurse or a police officer, they have no exact knowledge why they were going through a medical trauma. The record is clear that when the officers came out on the scene, they realized it right away by their observation. And, in fact, one of the officers said, you know, I don't inject the narcon unless I thought it was an overdose. But why did he think it was an overdose? Because he was called because there was an individual in distress, and when he looked through the window, he saw that she was passed out, turning blue, and then observed the needles. He did the right thing. Well, there's no question that he did the right thing. We're not questioning that. Counsel, do you want to spend a short time on your sentencing argument because your time technically is up? I understand. Just very briefly, and this is just an alternative argument, that I believe that given the fact that this young lady was in possession of not a four-tenths, the trial court record said she had no prior involvement. She clearly qualified for the four-tenth probation. And in the sentencing hearing, the trial judge just made comment, well, she's an addict. She's a this. She's a that. I don't think that the judge considered all the factors. And he can award four, I don't know if four is the proper way, rule that four-tenths in his discretion, but I think he could have taken it a step farther and cerebralized it. And so right now, this is my client, this young lady, 18 months of probation with a class four felony. I think she did qualify for four-tenth probation, and the judge could have looked at it in his discretion and ruled otherwise. Am I done? Thank you, counsel. You'll have an opportunity to reply. Thank you. Thank you. Mr. Stevenson. Okay. Good morning, Your Honors. Good morning. The court is meticulously prepared, as always. I think I can jump right into it. Obviously, very aware of the facts and the law. This is a question you didn't hear before, but I'm going to pose it to you, because as I prepared for this, I thought about this. If we make the decision the State's asking for, and this would be probably a case of first impression, so there would be a publication in this case, are we in some ways defeating the purpose of the statute in that people will be afraid to call because they don't? The idea is we're trying to save them, we're trying to save their life. It's a small amount, and they don't want to get in trouble. They were stupid, but they don't want to get in trouble. Are we now preventing people from calling because we say that this statute says that you can still be arrested if there are other circumstances available? Your decision doesn't encourage or discourage drug users. It may not be our reading audience, but it essentially says that. We believe that this information will modify the behavior. That's why we have criminal law.  But no, I don't think that your decision does. This was getting into the policy question that Justice Burkett was talking about, and it's an interesting one. What was the purpose of the legislature? Clearly, they want to prevent drug deaths for small-time drug users. As was discussed before, they could have simply said, in the case where you overdose, it's just a pass. We'll be nice to you. You suffered enough because you suffered an overdose. They could have done that. The other thing they could have done is simply say, under a certain amount, nobody's a criminal. That would also act to encourage people to seek treatment. But they did not do that. What they said was they took a first limited step and said, if you, using your own volition, decide to call for drug treatment for yourself or for a drug buddy, if I may use the term, we'll give you a pass. We're encouraging you to save lives, in this case for small amounts. So, no, I don't think that your decision is going to do that. If anything, it sort of encourages drug use because they'll say, well, if I'm lucky enough to overdose, then I get a free pass, which may have been part of the legislature's thinking. I don't know. Well, if you look at the argument that the defendant makes, to read this provision expansively, to be consistent with the legislative purpose. I'm sorry? To be consistent with the legislative purpose, which is to save lives. So there's no question that the evidence in this case was recovered as a result of the defendant obtaining emergency medical treatment. Even though she didn't initiate the action, someone else did, but she did obtain emergency medical treatment. No, she didn't. How about if I'm at your house and you decide you're going to give me a gift, and I leave my coat or a purse or something, and you say I'm going to give you a gift. You put $20 in my wallet or my purse, and I leave. I have obtained $20. You received $20. It's the difference between obtaining and receiving. I like words. I like lexicography. I actually looked up the etymology of obtain, and you can see that it's in the brief. Obtain requires volition on your own part. It requires you to take effort. It's not receiving. Receiving is a passive act. Obtaining is an active act. You have to do something. That's why it makes sense. You seek, and if you're successful, you obtain after having sought. Then what happened? She passively received aid from the officer after the officer was investigating a police emergency, a 9-11 emergency. He saw drugs. He saw her turning blue. I'm sure that police officers are trained to know when to give Narcan. He said, this meets the criteria. I'll give her the Narcan, and obviously it was the right answer. So if the statute actually read, rather than seeking or obtaining, if it read receiving, seeking, or obtaining, then you're saying it would apply? Yeah, that would be it, and the legislature could have done it, but they didn't. You also argue that it serves no purpose to provide immunity to someone who receives treatment while unconscious, because she or he could be neither encouraged or discouraged from acting in her own self-interest. Well, in this particular case, and we hope in others, the person's life is saved. Near death, they'll go, whoa, maybe I shouldn't do this anymore, and go into treatment, help themselves, and accomplish something by living. Don't you think this is a purpose of this statutory authority as well, to give up? No. I think I just have to say the plain no. That goes back to the prior policy thing I said. If you just wanted to say we think that people who almost die will see the light, then we'd go to receive. We wouldn't even care about it. We would say if someone almost dies, again, it's policy. It's not for us to say. That's what the legislature said how they want to dispense it, and I think that, as I said before, I think that there is a policy issue to say. You don't want to do it that way because then everything, well, that would have to be proof. But it laps over into, well, I almost died, so therefore, you know, it's intangible. That's why it's a policy matter. That's all the best I can say on that point. Let's see, are there any other things I wanted to get to? You also argue about caretaking, community caretaking. Do you really think that applies here? Yeah. Even though it's really kind of a Fourth Amendment-type concept because it's usually brought up in search and seizure issues. I'm sorry? Because it's usually brought up in search and seizure issues, and we don't have really any search and seizure here, do we? We have a limited search of the police coming in. Actually, there's a long section of Ludeman that goes into this, and there was a little bit of confusing discussion in the defendant's reply brief where he refers to the three tiers in consensual encounters and community caretaking. Ludeman makes it clear that the three encounters of arrest, theory, consensual encounter, those are justifications, and when they're correctly done, you can intrude on the private space of the defendant. That's one way. It's a completely different reason. To intrude in that private space is not as an investigation of crime function, but for the purpose of rendering community caretaking and emergency aid, which is a separate thing. That's how you get the intrusion, and thank goodness they did it here. That can lead to the discovery of evidence. That's what happened here. Was there a discovery of evidence, or was it all in plain view? Yeah, I believe so. Well, that's not even a search, then, is it? You could argue about how did they get in the proximity of the car. I'd argue yes, but I'm taking the conservative route. Even if it was a search, it was definitely justified by their exercising their emergency function for life-saving. But, again, they did here. Speaking about lives, can we talk a little bit about the allegation that the trial court should have imposed 410 probation? You know, Your Honor, I don't have much to say about that. Why not? You know, the defendant had one prior, correct? I'm sorry? She had one prior conviction for identity theft. Prior identity theft, she was on probation, I think it was 18 months. I don't recall exactly. She did have a drug treatment order. As a condition of probation. As a condition of probation. As my recollection, again, you've seen the record more recently than I, and, you know, the whole thing. The court, I believe, did comment that she did not do well on that. This is an abuse of discretion thing. The court's in a better position. The trial court's in a better position to determine these things. And she had a history of not doing well on this. But she did well while she was on bail here, in this case, correct? I don't recall. I don't. If she had not, I think I would put it in the briefs. The record reveals that. I just didn't recall. Let's see. Oh, the only other thing was I did notice that the defense said that part of the brief should be, our brief should be stricken because we did not supply authority for the proposition that an unconscious person can't seek or obtain medical help. Do I need to address that? Well, there's no harm in addressing it if you'd like. Huh? There's no harm in addressing it if you would like. Okay. Well, I think the court can take judicial notice of what is it called? Matters which are commonly known. So I think that's commonly known. People v. Melbourne, 249-LF3499, 5th District, 1993. So unless you have some questions, particularly about the consensual encounter versus, it's not a consensual encounter. It's community care taken, plain and simple. The trial judge seemed to think that the police, obviously, were going in response to the phone calls, but their reason for being there, that's to figure out this traffic problem then created a different situation. They were there to investigate traffic because people were unhappy that they were stuck. That seemed to be pretty important to the trial court. That's how they got there in the first place. Did that make a difference here, that they were worried about traffic? Nope. Because the investigation of the traffic stopped. Well, it's a 9-11. If I'm sitting in my car, I don't know what's happening to the driver of the car who's blocking traffic, so I call 9-11. I call them a lot, actually. You know, for people with things, you know, traffic. Oops. Chunk on the road. So, yeah, you just call, and there's a car blocking traffic. It's just sitting there. So police come in their community caretaking function. What is this? Do we need to tow it? Is there someone having car trouble? We come up to it. We see somebody slumped over. We open the door because people slumped over. That requires us to do something. She's turning blue. She's not breathing. We see drugs. Our training says, wow, better administer Narcan. So it's all of a piece. It all progresses along as part of a 9-11 recall. Thank you very much. Thank you. Thank you. Mr. Slough. May it please the Court, just a brief comment and reply. It was a comment whether the statute was, whether it could be used to either encourage or discourage drug users. I'd like to make comment on that because it's, when you have individuals, and in this case it was opiate or heroin addiction. It's not called addiction anymore. It's called opiate use dependency disorder. When an individual is suffering from opiate use dependency disorder, at that point, if they are chronic abusers of opiates or heroin, whether they're encouraged or discouraged is not the point. They physically need this to live. So when they go through the withdrawal, they don't die. Therefore, the point of the statute is not to either encourage or discourage an individual from, well, you know, I'll do this opiates, and if I overdose and go through a withdrawal, well, maybe I'll catch a break, and an officer, a fire department, someone paramedical will check me with Narcon and I'll pull this off. It's not quite that simple. This is a disease. Ms. Tepper had a disease. And, yes, Your Honor, in comment, she's been doing very well. During the pendency of the trial, she was in sober living facilities. She's, I think, about nine months into her probation. She lives in the city of Chicago now. So what I'm saying is that this isn't about encouraging or discouraging drug users. The intent of the statute is to save lives, because if an individual is at the point with heroin, I can't speak for any of the other narcotics. There's a whole list of them in Section, I think, D. Regarding opiates and heroin, if they are use-dependent, the statute isn't going to help them to encourage or discourage, and maybe if they OD, they can pull it off. They take this drug to sustain their life because they need it physically, and it's the withdrawal that kills them. So the intent of the statute here is to save lives, and it doesn't matter whether somebody sitting next to them calls 911 or individuals in Park City, Illinois call. It doesn't matter. The intent of the statute is to save lives. The intent of the legislature was to save lives, and I'm asking this court to give our state and perhaps every other state in this country some direction. You know, the criminal justice system and probation policies, which require strict compliance with the court's orders, are saving lives, too. Yes. And so your policy, and I understand your policy argument makes sense, but probation, county jail sentences, drug-ordered treatment also makes sense, and it is saving lives, like your clients. Your client is probably alive because she's under the thumb of the court. No doubt about it. Right. I'm not here to— I understand the point. Yes, I get it. There is a policy for both sides, and I was expecting to hear that from the state, but that argument that you make, although it has some appeal, the justice system, strict probation standards, treatment is saving lives as well. I acknowledge that, and if the court took it otherwise, I apologize. Clearly, drug testing, in fact, my client isn't here today because she's an IOP. So what? Intensive outpatient treatment, as per Judge Bridges' order. So I acknowledge that, and if the court thought I was brushing it over, I apologize. This is a very serious issue. On the 21st, the United States Attorney for the Northern District spoke at Wheaton, and he said this is a public health crisis. This is from the number one law enforcement official on the federal level in this northern part of our state. It's serious, and the intent is to save lives. It tempers before this court, but it's a much bigger, bigger issue, and I thank the court. Thank you, counsel, for your arguments. We appreciate the time and effort you put into it. We will take the matter under advisement, issue a decision in due course, and we are going to recess to prepare for our next case.